```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
United States of America,

                      Plaintiff,
                                              07-CR-0902 (CPS)
          - against -

Donald Mason,                                 MEMORANDUM OPINION
                                              AND ORDER
                      Defendant.

-------------------------------------X
```

SIFTON, Senior Judge.

Defendant Donald Mason (the "defendant") was indicted on December 20, 2007, on one count of knowingly and intentionally possessing a High Standard .357 revolver and ammunition, on November 26, 2007, having previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). A superseding indictment, filed January 10, 2008, charged that, on November 26, 2007, defendant (1) did knowingly and intentionally possess with intent to distribute five grams or more of cocaine base, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); (2) did knowingly and intentionally possess a firearm in furtherance of the crime charged in the first count, in violation of 18 U.S.C. § 924(c)(1)(A)(I); and (3) did knowingly and intentionally possess a High Standard .357 revolver, and ammunition, having previously been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Now before the Court is defendant's motion to suppress

physical evidence and various statements, which was the subject of a hearing before the undersigned on February 11, 2008. For the reasons stated below, the motion is denied. What follows sets forth the findings of fact and conclusions of law on which this determination is based.

**Background**

New York Police Department ("NYPD") Officers Mourad Arslanbeck and David Porras (the "Officers") are members of the Manhattan Impact Response Team, a division of the NYPD Housing Bureau. Feb. 11, 2008 Hearing Transcript (mistakenly dated Nov. 20, 2003) at 6, 135 (hereinafter "Tr. at ___"). Officers Arslanbeck and Porras, as well as other members of this team, "saturate high-crime public housing areas . . . to deter crime [by] flooding the area with a lot of cops. And also, to reinforce quality of life issues such as drinking in public." Tr. at 6. On the night of November 25 and continuing into the early morning of November 26, 2007, the Officers were on foot patrolling the Tilden Housing Development, which includes 265 Livonia Avenue, in Brooklyn, New York.[1] Tr. at 13-14, 16, 136. Officer Porras testified that he had been told by his supervisors that the Tilden development was a "high-crime area" that had

---

[1] The officers were temporarily assigned to neighborhoods in Brooklyn, including East New York in which the Tilden Housing Development is located, due to reports of an increase in the number of shootings in these neighborhoods. Tr. at 14. Prior to November 25 and 26, 2007, Officers Porras and Arslanbeck had patrolled the Tilden Houses on three to four occasions. Tr. at 15.

experienced what he described as "a mass of shootings and robberies." Tr. at 66-67.

Officer Porras testified that he had patrolled twenty-five or more public housing developments over the course of his career prior to November 25, 2007 and, during that time, had seen "hundreds" of people entering buildings in such developments. Tr. at 8. He testified that in his experience residents generally enter public housing buildings by using a key and that non-residents use a dial pad to ring the apartment of the person they are visiting. They announce themselves through an intercom to anyone who responds from the apartment, and then get "buzzed in" by the occupant of the apartment in order to enter the building. Tr. at 9. A panel next to the door at 265 Livonia Avenue in fact lists the apartments in the building and a corresponding four digit code to be entered on the dial pad to reach that apartment via the intercom. Tr. at 73-74; Gov't Ex. 3; Def. Ex. D.[2]

Officer Porras testified that "on rare occasions" he had also seen New York City Housing Authority employees or emergency workers gain access to public housing buildings employing pass codes entered into the same dial pad used to dial specific apartments. Tr. 9-10. Officer Arslanbeck also testified that

---

[2] "Gov't Ex. ___" and "Def. Ex. ___" refer to the exhibits received at the February 11, 2008 hearing before this Court. Other exhibits, attached to either party's pre- or post-hearing submissions, are identified as such.

he, too, was aware of this use of pass codes and that, in his experience, each building has a separate code. Tr. 138-39.[3]

The Officers entered 265 Livonia Avenue twice during their patrol. As the Officers are not issued either keys or pass codes, Tr. at 11, the Officers gained entrance to the building the first time by "piggybacking," entering as another person entered or left the building. Tr. at 29. The second time, the Officers were let in by an older gentleman who used a four digit pass code to open the door. Tr. at 25-26; 140-142. The Officers did not inquire whether the gentleman, who was standing outside the entrance but did not attempt to enter the building after he had let the Officers in, lived in the building or how he knew the code. *See* Tr. at 142.

A somewhat worse for wear sign in the lobby of 265 Livonia Avenue, posted above the mailboxes on the left side of the lobby, read in bold but delapidated lettering: "LOITERING AND TRESPASSING IN LOBB[Y, ROO]F, HALLWAY AND STAIRS NOT PERMITTED VIOLATOR[S] ARE SUBJECT TO ARREST AND PROSECUTION BY THE [NEW YORK CITY HOUSING AUTHORITY] POLICE DEPARTMENT." Tr. 34-25, 97; Gov't. Ex. 10. The chief investigator for the defendant credibly testified that he did not see any "No Trespassing" signs posted outside of 265 Livonia Avenue. Tr. at 167; *see also* Def. Exs. C,

---

[3] Both Officers acknowledged that the pass codes "get leaked out to . . . residents and other people" who use them to access the building, presumably without authorization from the Housing Authority. Tr. at 11; *see also* Tr. at 139.

B, L, K, and M;[4] Tr. at 162.

Following their second entrance into 265 Livonia Avenue, at approximately 1:55 a.m. on the morning on November 26, 2007, the Officers were standing in the lobby, positioned behind a column. Officer Porras had his back to the door and Officer Arslanbeck was in front of him, facing the door, but also at least partially concealed by the pillar. Only Officer Arslanbeck could see the door. Tr. at 90. The door to the building was made of metal, *id.*, with eighteen portholes, of which all but the three at the top and the three at the bottom were covered. Tr. at 91. Officer Porras testified both he and Officer Arslanbeck were "paying attention to how people [were] entering the building, whether with a key or piggybacking behind somebody." Tr. at 30.

At approximately 1:55 a.m., Officer Arslanbeck saw, through the bottom portholes of the door, an unidentified person approach. Tr. at 143. He also testified that he heard someone punching in numbers on the dial pad, "followed by a little beep and then . . . the magnets releasing from each other and the door opening." Tr. at 143-44. Officer Porras testified that he heard

---

[4] The government objected to the Court's receipt of defendant's exhibits B, C, K, L, and M on relevance grounds. The Court received the exhibits subject to a motion to strike. The government, in a footnote in its Post-Hearing Memorandum of Law in Further Opposition, so moved. I deny the government's motion to strike as the exhibits, photographs of the grounds and signs surrounding 265 Livonia Avenue and the building itself, demonstrate the lack of posted "No Trespassing" signs outside 265 Livonia Avenue. Such information is relevant to determining whether the Officers could infer that defendant knowingly entered or remained unlawfully in the building. *See infra.*

four beeps on the dial pad, the door open, and footsteps enter the building. Tr. at 40. Neither Officer heard a key in the lock, a buzzer, or any voice on an intercom. Tr. at 40, 144. Defendant then entered the building. Tr. at 41-42, 144.

The Officers came around the column and approached the defendant. Tr. at 42, 148. When they were a few feet away from the defendant, Officer Porras remarked to defendant that he did not enter with a key. Defendant did not respond. Tr. at 43-4, 47, 103-04, 112, 148.[5] Office Porras then asked defendant if defendant were a resident of the building, to which the defendant responded that he was not. Tr. 44, 99, 148. Officer Porras next requested identification from the defendant, which the defendant produced. Tr. at 45, 149. The Officers determined from the identification that defendant lived at 305 Livonia Avenue, a nearby building in the Tilden development. Tr. at 45, 100.

Officer Porras next asked where the defendant was going. Defendant stated that he was going to the "fourth floor." Tr. at 46; *see also* Tr. at 149. After this question, Officer Porras observed defendant "lift[]," "pick[]," or "pull" up his jeans by

---

[5] Though the entries in the memo books of Officers Porras and Arslanbeck indicate they observed defendant enter without a key, neither Officer recorded this exchange with defendant. Def. Ex. J, Gov't Ex. 3500-DP-2. Nor did Officer Porras testify about this exchange in his Grand Jury testimony. Tr. at 110.

the seams just below the pockets. Tr. 47-48, 112-13, 151.[6]

Officer Porras' practice in this situation was to escort defendant to wherever he was headed to verify if he was a guest. Tr. 12-13, 48. Officer Porras testified that he then asked defendant "if he had anything on him that might hurt my partner or I, if he had any weapons . . . I asked him if he had any weapons that might hurt my partner or I [sic]." Tr. at 48-49. Officer Arslanbeck recalled that Officer Porras asked the defendant if he was "carrying any weapons on him." Tr. at 149. Both Officers recalled that, following this question, the defendant's "attitude or demeanor totally changed." Tr. at 149. According to Officer Arslanbeck, defendant "got up, a little more rowdy, started waving his arms, speaking in a higher voice, cursing." Tr. at 149. Officer Porras similarly testified that defendant "began to act hostile," "was mad" and "start cursing." Tr. at 49, 113. He also testified that defendant's "arms went up and his stance widened." Tr. 114.[7] Both Officers testified that they attempted to calm defendant down. Tr. at 49, 149.

At this point, defendant "ran towards the door using his

---

[6] Officer Arslanbeck could not recall the exact point during the conversation that he observed this action, but also noticed defendant adjust his jeans. Tr. at 151. Officer Porras did not mention defendant's lifting of his pants during his Grand Jury testimony. Tr. at 113. The Federal Complaint notes that defendant, rather than lifting his pants by the seams, "adjust[ed] the waistband of his pants." Def. Ex. G.

[7] The State Court Complaint, which Officer Porras signed, notes that defendant flailed and waved his arms after Officer Porras attempted to put defendant under arrest. Def. Ex. H.

body to shove [Officer Porras] in the shoulder" and "pushed through Officer Porras." Tr. at 49, 149.[8] The Officers chased defendant and caught him before he reached the door. There was a brief scuffle, during the course of which defendant's jacket came off and his shirt lifted up. Tr. at 50, 149. During the scuffle, Officer Arslanbeck saw a firearm tucked into defendant's waistband and Officer Porras saw "what looked like the butt of a handgun." Tr. at 51, 149-50. Officer Porras used mace on the defendant, and defendant stopped resisting. Tr. 51.

Seconds after defendant was handcuffed, defendant said, "I'm holding." Tr. at 54, 151. At this point, defendant was handcuffed on the ground, on his stomach. Officer Porras rolled defendant to his side, reached into the front of his waistband, and recovered the firearm, which Officer Porras testified was a black .357 magnum, Sentinel MK III, from defendant. Tr. at 54, 56, 150. Neither Officer gave defendant his *Miranda* warnings at this point or later. Tr. 59, 155.[9] Defendant asked for some water, presumably because he had been sprayed in the face with mace, and stated "I'm going away for a long time." Tr. 57, 155.

---

[8] The State Court Complaint notes that defendant pushed Officer Porras only when Officer Porras attempted to put defendant under arrest. Def. Ex. H; Tr. 118-19. Officer Porras testified at the hearing that he did not draft the State Court Complaint, and attempted to make clear to the drafter that he was pushed before the arrest, not as he attempted it. Tr. at 117. In filling out an NYPD On line Booking Sheet, Officer Porras checked a box indicating that no force was used by defendant. Tr. at 120.

[9] Defendant was given his *Miranda* warnings at approximately 9:15 a.m., over seven hours after his arrest, by a Detective Mendez. Ex. E to D. Morris Feb. 4, 2008, Declaration.

After this exchange, Officer Arslanbeck searched defendant's jacket and found a black plastic bag containing a substance that was later determined to be crack cocaine, an electronic scale, and small ziplock bags. Tr. 58, 150-51.[10]

Defendant was subsequently transported to a nearby station house and a further search of the defendant revealed three cellular telephones, colored beads, and a small amount of cash. Tr. at 59. Defendant was placed in a detention room and at some point that morning requested to call his girlfriend. Tr. at 59.

**Discussion**

I. Fourth Amendment

Defendant argues the Officers lacked both reasonable suspicion for an investigatory stop and probable cause for an arrest and that the physical evidence and statements obtained from him should be suppressed as they were obtained in violation of his rights under the Fourth Amendment.[11]

---

[10] Defendant asserts in a pre-hearing declaration that the officers told him they were searching everyone who entered the building and that they searched him on this basis. Ex. F to D. Morris Feb. 4, 2008, Declaration (Decl. of D. Mason). Defendant also vigorously disputes that he ever adjusted his waistband. *Id.* I am unable to credit defendant's assertions. *See United States v. Polanco*, 37 F. Supp.2d 262, 264 n.4 (S.D.N.Y. 1999) ("the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing").

[11] The government argues that the Officers had probable cause to arrest defendant for:
  (1) criminal trespass in the third degree, in violation of N.Y. Penal Law § 140.10(e), which provides "A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property . . . (e) where the building is used as a public housing project in violation of conspicuously posted rules or regulations governing entry and use thereof";
  (2) harassment in the second degree, in violation of N.Y. Penal Law §

The Second Circuit has identified three levels of interaction that may take place between law enforcement officers and private individuals; consensual encounters, investigative detentions, and arrests. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). Consensual encounters require no justification so "'long as the police do not convey a message that compliance with their requests is required.'" *United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). Investigative detentions require "reasonable suspicion" to believe that criminal activity has occurred or is about to occur. *Id.* Arrests require a showing of probable cause. *See id*.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may briefly stop an individual without first obtaining a warrant if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. at 30; *see United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (officer must have "reasonable suspicion" to perform a *Terry* stop). To determine whether an officer had

---

240.26(1), which provides "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . (1) He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same";
    (3) disorderly conduct, in violation of N.Y. Penal Law § 240.20(1), which provides "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . (1) He engages in fighting or in violent, tumultuous or threatening behavior."

reasonable suspicion, courts "assess the totality of the circumstances supporting the investigatory stop . . . in order to decide whether the officer's suspicion of wrongdoing has an objective and particularized basis." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). In assessing whether probable cause existed, courts review the totality of the circumstances to decide whether an officer had "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990). "[P]robable cause is a flexible, commonsense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). If an officer has made an arrest based on probable cause, he may search a defendant pursuant to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218 (1973).

Beyond these exceptions (including a few others not relevant here) "[s]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment . . ." *Katz v. United States*, 389

U.S. 347, 357 (1967). Physical evidence derived from an illegal search or seizure is excluded from use at trial, as are verbal statements, unless the prosecution can demonstrate that such statements were made voluntarily and not tainted by the illegal seizure. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

An individual is seized by the police "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (internal quotations omitted). In *Lee,* the Second Circuit identified several factors that might suggest seizure, including:

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Id.*

There is no indication that any of these factors was present when Officer Porras asked if defendant was a resident of the building, requested defendant's identification, and asked where he was going. Until the defendant attempted to flee, the

Officers remained several feet away from defendant.[12] Defendant does not contend that he was touched, that the Officers displayed any weapons, held his identification for a prolonged period of time, or otherwise indicated that he was not free to leave. Thus, during this initial period, the encounter was consensual.[13] *See United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996) (in consensual encounter Officer may permissibly ask questions, including making a request for identification) (citing *Bostick*, 501 U.S. at 437); *United States v. Ward*, 1999 WL 130653, at *2 (S.D.N.Y. Mar. 11, 1999) (request by police officer in lobby of building to individual coming downstairs from the second floor as to whether defendant lived in building, where officer was in process of arresting another individual, did not implicate Fourth Amendment seizure).

Because Officer Porras reasonably believed he was going to have to accompany the defendant to his destination to verify that the defendant was an invited guest, he next asked if defendant was carrying anything that might hurt the Officers.[14]

The tone of Officer Porras' question appears less than confrontational and reasonable under the circumstances. Since

---

[12] I note at least one of the Officers must have approached defendant more closely to receive and inspect the identification proffered upon the Officers' request.

[13] Defendant appears to concede this point. Def. Post-Hearing Memorandum of Law, at 5-6.

[14] Defendant contends that he was seized at this point.

the question was connected to the preceding one asking where defendant was going, a reasonable person would have concluded that an alternative to responding to the question would be to retrieve his identification and leave the building. *See United States v. Ringold*, 335 F.3d 1168 (10th Cir. 2003) (what matters in determining whether person would feel free to leave is "the manner" in which questions are posed); *United States v. Kim*, 27 F.3d 947, 953 (3d Cir. 1994) ("potentially incriminating questions do not by themselves make an encounter coercive"); *see also United States v. Drayton*, 536 U.S. 194, 198-99 (1994) (holding there was no seizure and search was voluntary where officer informed individuals on bus he was searching for drugs and weapons and asked first to search defendants' bag and then defendants); *I.N.S. v. Delgado*, 466 U.S. 210, 220 (1984) (interaction between factory workers and INS agents questioning workers as to their immigration status "were classic consensual encounters rather than Fourth Amendment seizures").

Immediately following this question the defendant's demeanor changed and he attempted to flee, shoving Officer Porras in the process. Once defendant pushed Officer Porras and attempted to flee, the Officers had probable cause to arrest defendant for trespassing. It was late at night in a high crime area, the Officers had observed the defendant enter the building in a non-customary manner by using a pass code, and the Officers had

established that defendant did not live in the building, which had a posted sign, visible in the lobby, prohibiting trespassing. *See Matter of Bobby J.*, 249 A.D.2d 305 (2d Dep't 1998) (posted "No Trespassing" sign, high crime area, nervousness and attempt to avoid officer are factors relevant to probable cause determination); *see also United States v. Nunley*, 2002 WL 32086480, at *2 (D. Conn. Oct. 8, 2002) (knowledge that area was high crime and that defendant did not live in building relevant factors to probable cause determination for violation of criminal trespass statute). If these factors alone were not sufficient to establish probable cause, defendant's flight tipped the balance. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such").

A violation of N.Y. Penal Law § 140.10(e) requires knowledge that one's presence is unlawful and the rules governing entry and use of the premises be "conspicuously posted." Defendant argues that the "No Trespassing" sign was not "conspicuously posted" and that, for this reason, he did not have the requisite knowledge that he entered or remained unlawfully in the lobby of 265 Livonia Avenue. In *In re James C.*, 262 A.D.3d 262, 263-64 (1st Dep't 2005), the court held that the minor defendant's conviction for criminal trespass in the third degree could not stand because

the officer testified that, while there were "No Trespassing" signs in the lobby, he could not remember where they were, and the Court could therefore not conclude the signs were "conspicuously posted."[15]

The issue in this case is not whether the sign was "conspicuously posted" but whether the Officers could have reasonably believed a violation of N.Y. Penal Law § 140.10(e) occurred. Though partially torn, the sign was legible, particularly the portion prohibiting trespassing in the lobby. Gov't Ex. 10. It was approximately a foot long, and several inches tall. *Id.* A reasonable police officer would be justified in concluding that the "conspicuously posted" requirement of § 140.10(e) was satisfied.[16]

Once defendant pushed[17] Officer Porras and attempted to

---

[15] The other cases cited by defendant are inapposite. In *People v. Outlar*, 177 Misc.2d 620 (N.Y. City Crim. Ct. 1998), there were no posted "No Trespassing" signs. *In re Luis C.*, 66 Misc.2d 907, 910-911 (N.Y. Fam. Ct. 1971), deals only with the requirement of knowledge. In *People v. Mackey*, 16 Misc.3d 398, 400 (N.Y. City Crim. Ct. 2007), the officer never determined if signs were posted.

[16] Though not argued by the government, even if the signs were not "conspicuously posted", the Officers would have had probable cause to arrest for criminal trespass in the second degree following defendant's flight. N.Y. Penal Law § 140.15; *see also People v. Scott*, 8 Misc.3d 428 (N.Y. City Crim. Ct. 2005) (A person found inside the lobby beyond the vestibule of an apartment building operated by the New York City Housing Authority may be prosecuted for criminal trespass in the second degree whether or not the door to the lobby is locked, provided there is reasonable cause to believe that he or she had no legal right to be in the building).

[17] Defendant argues that the government has not demonstrated that his contact with Officer Porras was intentional. On direct and re-direct, however, Officer Porras testified that he was "shove[d]" and "pushed." Tr. at 49, 132. On cross-examination, Officer Porras, in response to leading questions, agreed that defendant "bumped into" him and that defendant's "body made contact with" him. Tr. at 116. When allowed to choose his own words,

flee, a person of reasonable caution would have been justified, based on the flight and the Officers' investigation up to that point, in believing that defendant was not authorized to be in the building and was fleeing because he knew this to be the case.[18] Accordingly, the Officers had probable cause to arrest defendant.[19]

For these reasons, defendant's motion to suppress the physical evidence and his statements, on Fourth Amendment grounds, is denied.

II. Fifth Amendment

Defendant also moves to suppress his post-arrest statements on Fifth Amendment grounds. Defendant made a number of post-arrest statements, including, "Why are you searching me, what the f*** I was just coming in the building," "I'm holding," that he did not have "any other weapon or contraband in his jacket" and that "he was going away for a long time" and wanted water. It is undisputed that defendant was not given his *Miranda* warnings until approximately seven hours after his arrest. He accordingly

---

Officer Porras stated that defendant had done nothing less than push and shove him.

[18] In hindsight, it is clear that defendant fled because he knew he was carrying a gun, crack, and various other drug paraphernalia, but this is of no moment to the probable cause analysis.

[19] Because the Officers had probable cause to arrest defendant for trespassing, I need not consider the government's contention that the Officers also had probable cause to arrest defendant for disorderly conduct, in violation of N.Y. Penal Law § 240.20, or harassment, in violation of N.Y. Penal Law § 240.26.

argues his post-arrest statements were obtained in violation of his rights under the Fifth Amendment.

The procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436 (1966), however, apply only where the defendant is subject to custodial interrogation by law enforcement officials, though it is well-settled that "interrogation" for *Miranda* purposes consists not only of "express questioning" but also its "functional equivalent" including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from a subject." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); accord *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987). Where the statements are not made in response to questioning or its equivalent, they fall outside *Miranda's* purview. *See Jones v. Poole,* 2007 WL 2456646, at *6 (S.D.N.Y. Aug. 21, 2007) ("Spontaneous statements not the result of interrogation are admissible evidence, regardless of whether Miranda rights have been administered"); *United States v. Bailey*, 468 F. Supp.2d 373, 390-91 (E.D.N.Y. 2006) (suspect's spontaneous statements were not made in response to interrogation and consequently not suppressible for absence of *Miranda* warnings); *United States v. Ayala*, 1986 WL 982 (S.D.N.Y. Jan. 15, 1986) ("It is . . . immaterial that *Miranda* warnings had not been given to [defendant], since no interrogation took place"). Here

the Officers neither asked any questions nor otherwise did anything beyond effect the arrest that would be the equivalent of interrogation. Accordingly, these statements are admissible.

Once defendant was given his *Miranda* warnings, approximately seven hours after his arrest, he stated he was not willing to answer questions. Detective Mendez nevertheless asked whether defendant had any information regarding other criminal activities in the area of his arrest. The government states that it will not offer defendant's negative, non-verbal response to this question at trial and thus the motion is moot as to this statement.

Accordingly, defendant's motion to suppress his post-arrest statements on Fifth Amendment grounds is denied.

## Conclusion

For the reasons set forth above, defendant's motion to suppress is denied. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.
SO ORDERED.

Dated :   Brooklyn, New York
          March 4, 2008

                By: /s/ Charles P. Sifton (electronically signed)
                    United States District Judge